# THE WORCESTER NATIONAL BANK

## *v.*

## PRENTISS D. CHEENEY.

1. RECORDING LAW—*deed filed for record and withdrawn, affords no notice.* Where a party presents a deed of trust to the recorder, who indorses it as " filed for record," and the party immediately, and before any entry is made in relation thereto, withdraws it for the alleged purpose of having a government stamp placed on it, and it is not returned for record for more than a month afterwards, the first filing is not sufficient to give constructive notice of the existence of the deed.

2. An instrument, to become constructive notice, must, in good faith, be filed for record and left with the proper officer for that purpose. His file-mark is not, in and of itself, constructive notice, but evidence only that the proper steps have been taken to give constructive notice, which may be shown to have been indorsed through fraud or mistake.

3. EVIDENCE—*to prove existence of a record.* The existence of a record can not be proved by merely balancing probabilities. If in existence, it proves itself, and if not to be found, the presumption is, it never existed, and those who affirm its prior existence must show clearly and satisfactorily that fact.

4. ATTACHMENT—*when no lien against rights of others.* Where no certificate of the levy of an attachment upon real estate is filed, the attachment and levy will create no lien as against *bona fide* creditors and purchasers of the debtor without notice.

5. CONSIDERATION—*forbearance and extension of time of payment.* The forbearance of a creditor, and his extension of the time of payment of the debt, constitute a sufficient consideration to support an assignment of notes secured by deed of trust to the creditor by a member of the firm indebted.

6. PROMISSORY NOTE—*indorsee taking as collateral security, is protected.* A creditor who takes a promissory note indorsed to him before its maturity, either in payment of his debt, or as a security for his debt, will be protected, and will hold the same free from latent defenses on the part of the maker.

7. SAME—*subsequent notice does not affect rights of indorsee.* Where a party takes a note by assignment before its maturity, which is secured by deed of trust on real estate, and without notice of any defense or equity, the assignment will carry with it the security, and his rights will be fixed, and can not be affected by any subsequent notice or information.

8. WITNESS—*credibility.* Where a party, who had indorsed notes secured by trust deed, to his creditor as collateral security, testified that the agent of the creditor, before the transfer, informed him that the property in the trust

deed had been attached; that he, the witness, was afraid the agent would get a dispatch showing the property attached, before he could get him to take the notes, and that he then informed the agent of the fact he was anxious to conceal, it was *held*, that the witness' testimony, even uncontradicted, was so absurd as not to be relied on.

9. FRAUDULENT CONVEYANCE—*notice of fact to two opposing claimants.* Where a person, making a loan to another, has knowledge that the property of the latter is in the name of his brother-in-law, to defraud creditors, he is in no better position than a creditor of the same party who takes from him, by assignment, notes given by the brother-in-law secured by a deed of trust upon such property, who also has notice of the fact that the property was kept in the name of the brother-in-law, to defraud creditors, in a contest between the two creditors as to their right to hold such property in payment of their several debts.

10. NATIONAL BANKS—*right to take real estate security.* The prohibition in the laws of Congress against national banks taking security for loans on real estate, does not extend to mortgages made in good faith by way of security for debts previously contracted, and they may take the assignment of notes secured by trust deed on real estate as collateral security for pre-existing debts due them.

11. DEED OF TRUST—*giving new notes does not discharge.* Where a member of a firm which was indebted to a bank, took up the indebtedness of the firm by giving his individual notes in its stead, with the express agreement that the notes and deed of trust of such member, then held by the bank as collateral security for the indebtedness of the firm, should remain, and be held as collateral security for the payment of such member's note, it was *held*, that this did not discharge the lien of the deed of trust.

12. SUBROGATION—*to rights of prior incumbrances paid.* Where a party, secured in his debt by deed of trust upon real estate, advances money to discharge prior liens on the same property, to protect his own security, he will be entitled to be subrogated to the rights of the holders of the prior liens, notwithstanding he may have taken a deed of trust on the same property from the debtor to secure such advances, especially when such trust deed is released.

13. MERGER—*when incumbrance is kept alive.* Where a greater and a less estate meet in the same person, a merger does not necessarily take place, and although a deed may be accepted as a foreclosure of a prior mortgage, yet, if the interest of the parties require that the mortgage should be kept alive, equity will so regard it, and not allow a right acquired under a junior lien to cut off rights under a senior mortgage.

APPEAL from the Circuit Court of Greene county; the Hon. CYRUS EPLER, Judge, presiding.

Mr. HENRY B. O'REILLY, Mr. C. D. HODGES, and Mr. WM. BROWN, for the appellant.

Messrs. WARREN & POGUE, for the appellee.

Mr. CHIEF JUSTICE SCHOLFIELD delivered the opinion of the Court:

This is a controversy between Prentiss D. Cheeney and The Worcester National Bank, of Worcester, Mass., in regard to a large steam flouring mill at Kane, Greene county. Cheeney's claim rests upon a sheriff's deed, made pursuant to sale on a special execution issued on a judgment in attachment in his favor, and against one George W. Howe. The claim of the bank rests, primarily, upon a trust deed in the nature of a mortgage, executed by Donald Carmichael to Marcus M. Johnson, to secure the payment of promissory notes for $15,000.

The purpose of Cheeney's original and supplemental bills was to have the claim of the bank declared fraudulent, as against his rights, and the several conveyances under which it makes claim, removed, as a cloud upon his title—and to this purport was the decree of the court below.

The proceedings in the attachment suit under which Cheeney claims were not commenced until February 4, 1871, and the bank claims that the trust deed of Carmichael to Johnson was filed in the proper office, for record, on the 31st of January, 1871, so that it necessarily has priority.

The evidence does not sustain this position. Carmichael did present the trust deed to the recorder, and the recorder indorsed it as "filed for record," but Carmichael immediately, and before any entry whatever was made in regard to the instrument, withdrew it for the alleged purpose of having the necessary government stamps placed upon it, and it was not returned for more than a month afterwards. This was not sufficient to give constructive notice of the existence of the instrument, within the intent of the Registry law. It was either a trick, or an act of gross negligence on the part of

Carmichael, and it could not affect the public. The clerk ought not to have permitted the withdrawal of the mortgage, with his file-mark upon it—but this affords no reason why the public should be affected by it. The bank, at that time, was not the owner of the instrument, and there is no pretense for saying that it or any one else interested in the mortgage did all the law required to be done to have it become a matter of record.

An instrument, to become constructive notice, must, in good faith, be filed for record, and left with the proper officer for that purpose. His file-mark is not, in and of itself, constructive notice, but evidence only that the proper steps have been taken to give constructive notice, which may be shown to have been indorsed through fraud or mistake.

Objection is taken to the sufficiency of the affidavit on which the writ of attachment in favor of Cheeney, against Howe, was issued—and it is also objected that no certificate of the levy of the attachment upon the property in controversy was filed, as required by statute. The latter only of these objections we deem it worth while to consider.

Although the evidence on this point is somewhat conflicting, we regard the preponderance as in favor of the bank.

The attorney who prepared the affidavit, etc., and caused the writ to be issued, shows that he was very careful, in consequence of the large amount in controversy, to have everything done required by the statute to perfect the lien, and he says he prepared the certificate of levy. He does not, however, pretend that he saw it filed, or that he saw it after it was filed, and admits that his knowledge does not extend that far. After commencing the proceedings, he removed from the State, and the declaration was filed and judgment obtained by another attorney. That attorney thinks that he once saw a certificate of levy among the papers, but is not positive. He says: "My remembrance of certificate of levy is indistinct; I examined the case papers; I saw the affidavit was there right; the attachment was there, and I went and procured the

certificate of publication; I have no special remembrance of having seen a certificate of levy, but there is an impression upon my mind that I saw it."

Cheeney, in testifying, speaks with some positiveness of having seen the certificate of the levy, but, from his further examination, it is quite evident that he was very liable to have been, and doubtless was, misled by another paper.

Opposed to this evidence is, first, the fact there is neither any certificate of levy on file, nor any record or memorandum anywhere tending to show that such a paper was ever in existence; and those in charge of the circuit clerk's office, at the time it should have been made, and since, have no recollection of such a paper. The attachment papers were indorsed filed by a deputy clerk, who has, ever since, been in the office, and neither he nor the clerk has any recollection that a certificate of levy was filed, nor have they any recollection of ever having seen one. They give it as their opinion that no such paper ever was filed. And, secondly, the writ of attachment was levied by a deputy sheriff, and, if a certificate of levy was filed, it must have been by him. He has no recollection that he ever filed a certificate of levy, and says that he was not instructed by the attorney having in charge the attachment proceedings that it was his duty to do so.

He speaks with some positiveness, and says that he does not believe that he ever filed a certificate of levy, and he is corroborated in his recollection by his indorsement of his charges for costs on the writ of attachment, made at the time of making the levy, in which there is no item for filing a certificate of levy.

The witnesses are all gentlemen of undoubted integrity, and the attorneys who represented Cheeney are of deservedly high standing in their profession. There is no reason for attributing improper motives to any one. The evidence of the attorneys is deficient simply in the fact that it does not show with certainty that the certificate of levy was actually filed. The existence of a record can not be proved by merely bal-

ancing probabilities. If in existence, it proves itself—if not in existence, the presumption is, it never existed, and those who affirm its prior existence must show clearly and satisfactorily that fact—not merely its probability.

The evidence failing to satisfactorily prove that a certificate of the levy of the attachment was filed, the attachment created no lien as against *bona fide* creditors and purchasers without notice.

But the point is made, that the bank is not a *bona fide* purchaser. The facts are these: A firm, composed of George W. Howe, Marcus M. Johnson and Charles H. Schnell, was engaged in business at Kane, Ill., under the firm name of "M. M. Johnson & Co.," and at Worcester, Mass., under the firm name of "The St. Louis Flour Company." It is, also, probable that Donald Carmichael was a secret member of this firm, at the time the transactions in controversy occurred, but we do not regard this of any special importance. The business of the firm was, the manufacture and sale of flour, feed, etc. The manufacturing was done at the mill at Kane, and the sales were, chiefly, effected by the house at Worcester. George W. Howe was, in reality, the principal, if not the sole, owner of the firm property and business—certainly, Johnson and Schnell had but a purely nominal interest therein.

Howe, on behalf and in the name of the St. Louis Flour Company, contracted indebtedness to the Worcester National Bank, to the amount of some $10,000, for discounts, loans, etc. To secure this, certain collaterals at Worcester were deposited; but the bank was pressing for its money or additional security, and the company was not ready to pay. The property in controversy was held by Donald Carmichael—the brother-in-law of Howe—in secret trust for Howe. At Howe's request, he executed his promissory notes, to Marcus M. Johnson, for $15,000, and gave the deed of trust on the property in controversy to secure their payment. The notes and deed of trust were then assigned by Johnson to the Worcester National

Bank, and accepted by it, as collateral security for the $10,000 indebtedness of the St. Louis Flour Company.

Several objections are taken to this assignment, which will be noticed in their order.

It is argued, there was no consideration—that the bank paid out no money, incurred no debt, and was in no manner put in a worse condition by the transaction than it would otherwise have been in, and *Powell* v. *Jeffries*, 4 Scam. 387, is cited to prove there was, therefore, no consideration. In that case, it does not appear that there was any agreement, either express or implied, to forbear suit upon the indebtedness; while here, it is shown there was such an agreement. Cross, in his testimony, positively says that the consideration of the assignment of the notes and deed of trust was, the extension of time of the debt of the St. Louis Flour Company—and this has always been held a sufficient consideration to support a contract.

In *Manning* v. *McClure et al.* 36 Ill. 490, this court had occasion to investigate the question, to what extent the indorsee of negotiable paper, before its maturity, taking it as payment or security for a pre-existing debt, is entitled to be protected; and, after an extended and careful examination of authorities, it was said: "We are led, then, by what we consider the equities between the parties, and by the acknowledged policy of giving stability to negotiable paper, to hold that the indorsee of such paper, before its maturity, taking it as payment or security for a pre-existing debt, and without any express. agreement, shall be deemed a holder for a valuable consideration, in the ordinary course of trade, and shall hold it free from latent defenses on the part of the maker." See, also, 1 Daniels on Negotiable Instruments, §§ 829, 830.

It is also argued that the bank can not be regarded as a purchaser in good faith, because, at the time of the assignment, it had actual notice of the levy of Cheeney's attachment.

The attachment was levied on the 4th of February, 1871. The assignment of the notes and deed of trust was made at

Worcester, Mass., on the 8th of February, 1871. At that time, the bank became the lawful holder of this security, and the rights of the parties were fixed by the agreement of that date. It is true, the bank, subsequently, made inquiry to ascertain whether the indorsement of the notes sufficiently vested it with title to the security, and the party representing it expressed doubts in that regard; but this all related purely to the mere matter of the form in which the evidence of what had been done should be put, to effectually carry out the intention of the parties. The contract was not conditional. All that was conditional depended on whether the indorsement already made, sufficiently vested the bank with the title to the security. If it did, nothing remained to be done; if not, then a sufficient instrument to effect that purpose was to be executed. Equitably, in any contingency, the security then belonged to it, for such was the intention of the parties; but, as the indorsement of the notes legally carried the deed of trust, the bank then was, both legally and equitably, the holder of the security, and no subsequently acquired information could affect the original transaction by which it became such holder.

The testimony of Howe, however, is to the effect, that he told Cross, the representative of the bank, before the assignment of the notes, that Cheeney had commenced suit against him by attachment. He says: "Cross is mistaken about not having notice of attachment before February 8, 1871. After I got a dispatch as to the attachment, I wanted to get this mortgage through with the bank without any trouble at all. I am pretty sure I got a night dispatch. I kept it from Carmichael. I was afraid, all the time, Cross might get a dispatch any moment. I think I went to Cross, at his house, that night—either in the bank or at his house. I told him about Cheeney's attaching, at the time. It was before February 8." He had also said, previously: "Cross told me he heard Cheeney had attached. It was certainly before the transfer of the mortgage was consummated. * * * I was posted by Johnson by letter and telegrams as to intention of

39—87 ILL.

Cheeney to attach—but of course I did not let Cross know anything of this kind."

Such testimony, even uncontradicted, ought not to be relied upon. If Cross knew that the attachment suit had been commenced, and so informed him, why was he afraid that Cross might get a dispatch? Above all, why did he himself give Cross the very information he was afraid he would get from some one else? He was anxious, after he got a dispatch that the attachment suit was commenced, to get the mortgage through, and yet told Cross that the attachment suit was commenced. Why so anxious to keep the secret from Carmichael and yet communicate it to Cross? The whole thing is absurd. Cross, as a prudent banker, would not have touched his security, had he known it was incumbered by Cheeney's attachment—at least until after full investigation; and this was evidently the reason why Howe was anxious to get the mortgage transaction closed as speedily as possible. He wanted forbearance on the debt, and he knew he could not get it except upon good security.

It is worthy of notice, in this connection, that Johnson, although sworn as a witness, says nothing of communicating information to Howe of the commencement of the attachment suit before the 8th of February, and that when Howe and Cross went to the legal adviser of the bank, at Worcester, to take counsel in regard to this security, not a word was said about Cheeney's attachment. Cross positively and unequivocally denies every statement of Howe in regard to notice of the commencement of the attachment suit, and his evidence is quite sufficient to overcome all in that regard by Howe.

It is again argued, that Cross, as the agent of the bank, knew, at the time of this assignment, that the title to this property was fraudulently held by Carmichael to enable Howe to defraud his creditors.

If this were admitted, it places the bank, in this respect, in no worse condition than that in which Cheeney is, since the proof very clearly shows that when Cheeney made his loan to

Howe, which constitutes the debt upon which his attachment is sued out, he had full information that the property was held by Carmichael for Howe, to keep a St. Louis creditor from reaching it, and that he took an assignment of other property thus held by Howe, as attorney in fact for Carmichael, to secure his loan.

But the fact is not proved that Cross, at the time of the assignment, had such knowledge. Even Howe, who is relied upon to prove the knowledge, only says: "I told Cross, confidentially, that I owned this property, and how I owned it, and I told him Carmichael would do as I wished. Cross said, it was well enough to mention it to him, but better say nothing outside. I gave him fully to understand the mill was my property. I don't think I ever told Cross that it was a fraudulent transaction—that would not be my way of doing business. I didn't tell Cross more than I was obliged to, at that time. I didn't say any more to Cross than I was obliged to—I can tell you that. I didn't enlighten Cross any more than I was obliged to, because I wanted to get the thing through."

The evidence does show that Howe, in his early conversations with Cross, represented himself the owner of the property in controversy; but it is to be remembered, when these representations were made, there was no anticipation by Cross that the bank would have to take a lien upon it to secure Howe's indebtedness. Howe was then endeavoring to convince the representatives of the bank of his solvency and good standing as a business man—not that this property would be a sufficient security for a given amount of indebtedness; and the representatives of the bank were induced to believe that he was solvent and of excellent business standing—not by reason of his representations of his ownership of this property, but by reason of the representations to that effect of their correspondents—Wm. M. Shepherd & Co., bankers at Jerseyville, Ill., and others, to whom they applied for information before giving credit to his firm. A representation thus made could not be regarded as of any special significance, so far as the question

under consideration is concerned.   It was not until the ability
of the St. Louis Flour Company to meet its liabilities to the
bank became questionable, that the attention of those repre-
senting the bank was directed to this property as a security—
and there is nothing in the evidence which shows either that
the officers of the bank had actual notice that Carmichael
was holding the title to enable Howe to defraud his creditors,
or that such circumstances were brought to their attention as
must charge them with that knowledge.   Cross says: "In
December, 1870, Howe, finding money must be obtained from
some quarter, stated to me (Cross) that his brother-in-law,
Carmichael, a man of means, would probably help him.   *
*   *   In December, 1870, it became apparent that, unless the
concern could raise money from some quarter, the bank would
be obliged to call in the debt and close up the store.   Howe
was in a state of great perplexity, begging me not to sacrifice
the years of labor and money he had expended in trying to
establish what seemed to promise a successful business.

"Then, for the first time, was the idea of accepting a mort-
gage entertained.

"On inquiry, I then first learned that the mill property had
been involved in complications.   Howe stated that, under
some chancery sale, he held a certificate of purchase which
would entitle him, shortly, to a deed.   All this not being clear
to me, I requested Howe to furnish an abstract of title, which
he handed me early in January, 1871, and, by it, the property
appeared to vest in Carmichael.   At the same time, he deliv-
ered to me notes of Carmichael, and mortgage, which, on
examination, was considered defective in form, etc., and rejected
January 13, 1871.

"Early in February, 1871, Carmichael himself came to
Worcester, and brought with him another mortgage, the one
in question, dated January 27, 1871, certified by T. J. Carlin,
recorder," etc.

Again, he says: "The attested record of title seemed to be
conclusive as to Carmichael's property in the mill, and the

policies of insurance described him as the owner. The certificate of title was an absolute assurance—the report of the mercantile agency, too, as also the personal assurance of Howe and Carmichael."

And, again, he says: "At the time we received this mortgage, we had no knowledge whatever of any fraudulent collusion between Howe and Carmichael. We learned that Carmichael's personal obligations were sufficient—the mortgage was a mere incident.    *    *

"Howe seemed honestly anxious to secure the indebtedness of the firm.

"I never had any secret conversation with Howe; never anything but the most straightforward, simple and open conversations, in regard to any of his transactions. I never had any confidential conversations with him with reference to the ownership of this mill property, in any way, shape or manner whatever."

Another objection urged against the validity of the assignment is, that the Worcester National Bank is, by the statute under which it is created, prohibited to take mortgages on real estate, etc.

A sufficient answer to this objection is, that the prohibition does not extend to mortgages made, in good faith, by way of security for debts previously contracted.

Power is expressly given to every National bank, by the second sub-division of section 5137 of the Revised Statutes of the United States, p. 999, to purchase, hold and convey such real estate "as shall be mortgaged to it, in good faith, by way of security for debts previously contracted." See, also, *First National Bank* v. *Exchange Bank*, 92 U. S. (2 Otto) 122.

It has been seen that, in the view we take of the evidence, the deed of trust under consideration was assigned to the bank in good faith, by way of security for debts previously contracted.

But counsel contend, that, waiving these objections, the St. Louis Flour Company was paid by Carmichael on the 28th of

April, 1871, and that thereby the deed of trust became satisfied, and so ceased to be a lien upon the property.

The evidence upon this point is this : Pursuant to an agreement between Howe, Carmichael and the bank, Carmichael, on the 28th of April, 1871, took up the indebtedness of the flour company by giving his individual notes in its stead; with the express agreement, however, that the notes and deed of trust to Johnson should still remain and be held as collateral security for the payment of the debt.

There can be no question, under the authorities, that this did not discharge the lien of the deed of trust. *Edgerton et al.* v. *Young et al.* 43 Ill. 464; *Flower et al.* v. *Elwood et al.* 66 id. 438; Jones on Mortgages, § 926 ; 1 Hilliard on Mortgages, (2d Ed.) 449.

The only remaining point to be noticed arises thus :

There was a prior deed of trust upon the property, to one Green, as trustee, known as the " citizens' mortgage," and also a mechanic's lien, upon which decree had been rendered, which was entitled to priority over the Johnson deed of trust. Cheeney bought these prior liens and held them for his benefit, refusing to sell or assign them. Carmichael paid to Cheeney's agent all that was due upon them except $4500. This amount the Worcester National Bank loaned him for the purpose of paying off the liens, and he so applied it, satisfying in full the amounts due upon them. At the time of effecting this loan, and to secure the bank therein, Carmichael executed a deed of trust on the property to one Klein, as trustee. When the last payment was made by Carmichael on " the citizens' mortgage," Green, the trustee, conveyed the property (pursuant, as is claimed, to a provision in the deed of trust requiring a reconveyance, upon the payment of the debt secured, to the grantor in that instrument or his assigns) to Carmichael. Afterwards, and on the 28th of July, 1875, Carmichael quitclaimed and surrendered possession of the property to the bank, and all his notes were then surrendered to him. It is declared, in Carmichael's quitclaim, to be " the true intent and

meaning of this conveyance, and the grantors do acknowledge and deliver the same upon the express condition that this conveyance shall be in law and equity a full foreclosure of the several mortgages, deeds of trust and liens held by Klein (trustee) and said Worcester National Bank, to secure the payment of said promissory notes, and that the said grantors and their heirs are, by the acceptance hereof, released from all liability whatever by reason of any or either of said notes, mortgages or deeds of trust." It is contended, first, that the bank is not entitled to be subrogated to the liens for which it loaned money to make payment, and secondly, that the deed of Carmichael wiped out the prior deeds of trust, etc., and Cheeney's title being prior to that, must prevail.

The advancement of the money by the bank to pay off the liens, was essential to the protection of its security, and, to the extent of its advancement, it is entitled to be subrogated notwithstanding it took a deed of trust from Carmichael on the same property, to secure it. Jones on Mortgages, § 885.

As to the other point, the ruling of this court is, where a greater and a less estate meet in the same person, a merger does not necessarily take place. Although a deed may be accepted as a foreclosure of a prior mortgage, yet, if the interests of the parties require that the mortgage should be kept alive, equity will so regard it. *Edgerton et al.* v. *Young et al. supra; Flower et al.* v. *Elwood et al. supra.* And a junior mortgage will not be allowed to cut out rights under the senior mortgage in such case. *Richardson* v. *Hockenhull*, 85 Ill. 124.

We think that justice and equity here require that the two estates should be kept separate.

The decree is reversed and the cause remanded.

*Decree reversed.*