DETERMINED IN THE

## THIRD DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

### DURING THE YEAR 1925.

Thomas W. Miller, Alien Property Custodian, Successor to Francis P. Garvan, Phil Wood, Executor, et al., Appellees, v. William C. Paul and Mary Paul, Appellants.

### Gen. No. 7,793.

1. WAR—*rights of alien property custodian in property of naturalized citizen resident in Germany.* The alien property custodian had the right to take and enter into possession of all the rights and property of one who, originally a native of Germany, had become a naturalized American citizen but had returned to Germany and lived there for a number of years and was residing there at the time said custodian made demand for possession, under the provision of the "Trading with the Enemy Act" defining as an "enemy" any individual of any nationality resident within the territory of any nation with which the United States is at war.

2. CONTRACTS—*construing instruments executed contemporaneously together.* A warranty deed, quitclaim deed and a note and mortgage executed by the same parties at about the same time and in relation to the same subject matter are to be construed together.

3. MORTGAGES—*admissibility of parol evidence to modify terms of mortgage.* Where notes and a mortgage given by a son to secure the payment of the consideration for a farm conveyed by his father to him were shown to have been made as the father intended and directed that they should and in accordance with

(166)

Miller v. Paul et al., 237 Ill. App. 166.

the contract between the parties, parol evidence was not admissible to show that it was intended to secure only the payment of an annuity to the father amounting to the interest provided for therein.

4. MORTGAGES—*when release not effected by quitclaim deed to mortgagor.* Release of a mortgage was not effected by the execution by the mortgagee and his wife to the mortgagor of a quitclaim deed which purported to transfer no rights except such as the wife had to dower in the property and was intended to convey no other rights.

5. FORECLOSURE OF MORTGAGES—*interest recoverable under bill to foreclose.* Where the demand of the alien property custodian for the principal and accrued interest under a mortgage to one coming under the "Alien Enemy Act" was based on the report of the mortgagor that the interest had been paid in full to a certain date, recovery could be had of interest accrued and unpaid before that date under a bill praying that an account be taken and defendants ordered to pay whatever sum may appear to be due and for other and further relief.

6. APPEAL AND ERROR—*right of nonappealing parties to file briefs.* The executors and legatees of a mortgagee who came under the Alien Enemy Act and who before his death joined with the alien property custodian in a suit to foreclose the mortgage against the mortgagor who claimed that the principal named in the mortgage was not to be paid but that the mortgage was given to secure only an annuity during the life of the mortgagee, have an interest in supporting the decree of the lower court in favor of plaintiffs, are proper parties to be heard on the appeal therefrom, and there was no error in permitting them to file briefs though they did not take an appeal.

Appeal by defendants from the Circuit Court of McLean county; the Hon. EDWARD BARRY, Judge, presiding. Heard in this court at the October term, 1924. Affirmed. Opinion filed March 6, 1925.

A. E. and R. C. DeMANGE, for appellants.

W. W. WHITMORE, for Thomas W. Miller, appellee.

COSTIGAN & WOELRAB, for Phil Wood et al., appellees.

MR. PRESIDING JUSTICE SHURTLEFF delivered the opinion of the court.

This suit was instituted by a bill in equity, filed by

appellee Thomas W. Miller as alien property custodian of the United States, against appellants William C. Paul and Mary Paul, his wife, and John Paul to foreclose a mortgage against a farm of 83 acres of land in McLean county, given to secure an indebtedness of $10,000 and interest, executed on August 21, 1906, by appellants to John Paul, father of said William C. Paul, and claimed by said John Paul to represent the purchase price of said lands. The note and mortgage are in the usual form, the note bearing interest at the rate of 4 per cent per annum, with interest coupon notes providing for the payment of interest thereon at the rate of 4 per cent per annum after maturity, and all of said indebtedness falling due on March 1, 1917. The mortgage contains a provision: "Privilege is given to pay even hundreds at interest-paying dates."

John Paul was originally an emigrant from Germany and became a naturalized citizen of the United States in the circuit court of McLean county in the year 1880. He had been twice married, his first wife dying in 1901. William C. Paul is the only surviving child of said marriage. After the death of his first wife John Paul made two or three trips to his old home in Germany prior to 1906 and on one of these trips married his brother's widow. The testimony does not show that this wife refused to return to America to live with her husband, but that they remained in Germany, the said John Paul returning alone in August, 1906, at which time the transactions in question were carried out, after which Paul returned to Germany and was there during the war period.

In view of the situation and under the provisions of the "Trading with the Enemy Act," on April 18, 1918, William C. Paul reported the existence of said mortgage and notes to the alien property custodian, as held

by the said John Paul, and reported that the interest on said indebtedness had been paid up to March 1, 1916. This was followed by a demand, under the act, made by the alien property custodian, upon said William C. Paul on the 28th day of June, 1918, to pay and turn over to said custodian said sum of $10,000, together with any interest accrued thereon to date of payment from March 1, 1916. This was followed in July, 1918, by the affidavits of said William C. Paul and William C. Mahaffey, the scrivener who had drafted the warranty deed, notes and mortgage in 1906, between said John Paul and his son, setting out statements and facts which purported to show that the said instruments did not truly represent and cover the actual arrangements and contract entered into between said father and son, but that the said William C. Paul was to have a warranty deed of said lands and the mortgage and notes were given only to secure an annuity of $400 per annum from the said William C. Paul to his father, John Paul, and that the scrivener had made a mistake in the preparation of said papers and had prepared the mortgage and notes to secure the principal of said indebtedness. It appears that following the submission of these affidavits the alien property custodian filed this bill to foreclose the mortgage. The warranty deed given by John Paul to his son, William C. Paul, was not signed by the wife of John Paul, so that a quitclaim deed was prepared in 1906, which John Paul took with him to Germany for said wife to sign, and the same, made out in the name of the wife only as grantor, but signed and executed by both John Paul and his wife, was returned in October, 1906, to William C. Paul and duly recorded and the testimony of William C. Paul shows that this deed was taken only to release the wife's inchoate right of dower in said lands.

Appellants answered the bill, setting up their claim of the error and mistakes in the drafting of said mort-

gage and notes by the scrivener, as set out in said affidavits, and averred of said annuities there was due to said John Paul the sum of $3,050, and it was shown by the answers that in 1915 said appellants had procured a draft, payable in German money, for the sum of $150, which had not reached the father, and that said German money, at the time of filing answers, had become worthless. The answer alleged the payment of said annuities to the year 1915 and that said sum of $3,050 was the total indebtedness from appellants to said John Paul, and by an arrangement and stipulation this amount was paid into court to abide the result of the suit.

Appellants also filed a cross-bill asking affirmative relief to cancel said notes and mortgage as to the principal of said indebtedness. The answer and cross-bill charged that shortly after the execution of said instruments the said John Paul departed for Germany, and that his last known address was "Lubz in the Province of Mecklenburg-Schwerin, Germany," but averred that he was a citizen of the United States.

At the time of the filing of answer and cross-bill for appellants, an answer and cross-bill was filed in the name of said John Paul, by the same counsel, setting out many of the facts and allegations in appellants' answer and cross-bill, denying that said appellants were indebted to him in the principal sum of $10,000 and, in substance, alleging the same matters as to the mistake in drafting said notes and mortgage, and charging that cross complainant was entitled only to an annuity in said lands to the amount of $400 per annum, and further charged his inability to receive any word from his son during the war and the very destitute condition of the defendant and cross complainant, and averred his American citizenship and unfortunate condition and situation by reason of the war and prayed the affirmative relief that said annuity be awarded to him.

It is evident that John Paul had no knowledge of

this answer and cross-bill.   There were answers to cross-bills and replications, the cause was referred to the master in chancery and proceeded to a hearing in the year 1922.   On December 23, 1922, through counsel representing said John Paul in this cause, a motion was presented in his behalf, asking that the reference to the master be set aside and that said Paul be permitted to answer the original bill, and affidavits were presented, later substantiated by proofs, that commencing early in 1921 said John Paul had written his son, appellant, informing him of his destitute condition and need of money, and receiving no answer from his son to numerous communications, the father had written to other friends in McLean county asking them to see his son in his behalf and obtain from him funds so that he could return to America and look after his interests, and the letters were later made a part of this record, to none of which did the son give any heed, nor did he aid his father in any manner, but the father later was enabled to employ counsel in Illinois through the assistance of the German consul, and make his way to his old home by the help of strangers, and even after landing in New York and in quarantine at Ellis Island in the spring of 1923, and requiring a bond that he would not become a public charge, before he could proceed to his old home, a telegram to that effect brought no response from his son, and again he was required to seek aid from strangers.

John Paul, on the withdrawal of the answer and cross-bill filed in his behalf, answered appellee's bill to foreclose, admitted all of the allegations in said bill and joined the alien property custodian to wrest this property from his son and have it to the full amount of said indebtedness placed in the hands of the alien property custodian.   Proofs were submitted and there was a report by the master finding that appellee was entitled to the relief prayed for in said bill of complaint, and finding the principal of said indebtedness

to be $10,000 and interest to the amount of $5,730.61 due, including the sum of $3,050 unpaid interest paid into court. The mortgage provided that said indebtedness should draw interest at the rate of 5 per cent per annum after due.

There were objections filed to said report, which were overruled and made exceptions before the chancellor, and upon a hearing the chancellor entered a decree of foreclosure for the amount of $11,161.10 principal and interest, in addition to the sum of $3,050 interest paid into court. Appellants have brought the record to this court by appeal and assign various errors.

On December 30, 1923, before the termination of this litigation in the lower court, John Paul died, leaving a last will and testament which has been duly probated in McLean county. John Paul's wife in Germany having died, this will, executed on the 28th day of April, A. D. 1923, willed and devised all of his estate to Rudolf Paul and Henry Paul of Hamburg, Germany, the will reciting:

"My son and his wife have shown a general disposition to disregard me in this world, and have endeavored to deprive me of even a part of what I was entitled to under said mortgage, and instead of trying to make the latter years of my life more comfortable, they have burdened me with sorrow."

The executor of this will did not take an appeal from the decree, but upon motion has been permitted to file briefs as an appellee, of which we shall comment later.

As to the assignment of errors and the equities between the appellants and appellee, the alien property custodian, under the "Trading with the Enemy Act," passed by Congress in 1917, whenever authorized by the President, should enter into the possession of any money or other property owing to, belonging to or held for the benefit of an enemy or ally of an enemy not holding a license granted by the President, and it

was further provided that any such money or property should not be liable or subject to any lien, attachment, garnishment, trustee process, or execution, or subject to any order or decree of any court. The only exception to these provisions was that the claimant might within six months after the close of the war bring an equity suit in the District Court of the United States to have his rights determined. Proper executive orders were promulgated at the commencement of the war with Germany, directing the alien property custodian to make demands and such officer was clothed with discretion in enforcing payment, granting indulgences, making extension or accepting security, and in exercising any other right, power or authority of the enemy. Under executive order the President vested in the alien property custodian the executive administration of all the provisions of sections 6, 7, 8, 9, 10 and 12 of said act.

Under the provisions of a Federal Act passed in 1907, "expatriation," among other things, was defined as: "When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state, it shall be presumed that he has ceased to be an American citizen," etc.

The "Trading with the Enemy Act" provides that the word "enemy" as used shall be deemed: "(a) any individual  *  *  *  of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war," etc.

Under the provisions of the "Trading with the Enemy Act" and the executive orders made in pursuance thereof, coupled with John Paul's long residence in Germany, there can be no doubt about the right of the alien property custodian to take and enter into the possession of all the rights and property of John Paul at the time said demand was made and the bill filed.

The warranty deed, the quitclaim deed and the note

and mortgage executed by the same parties and at about the same time and in relation to the same subject matter, are to be construed together. *Gardt v. Brown,* 113 Ill. 475; *Canterberry v. Miller,* 76 Ill. 355; *Wilson v. Roots,* 119 Ill. 379.

Oral testimony was introduced in this case, by appellants, tending to vary and contradict the written terms and covenants of the notes and mortgage, over the objections of appellee. It is not necessary to cite cases adhering to the elementary rule that this cannot be done unless such testimony is based upon some equity like fraud, accident or mistake, rendering the instrument defective or void. The law is that where there is no ambiguity in the terms used or where the language of the instrument has a settled meaning, the instrument itself is the only criterion of the intention of the parties and its construction cannot be explained by oral evidence. *Wilson v. Wilson,* 268 Ill. 270. No fraud or accident is charged or attempted to be shown in the drafting or execution of the notes and mortgage in question. There is an attempt on the part of appellants to claim and show that the scrivener, William C. Mahaffey, who drew the papers, made a mistake in drafting notes and a mortgage for a principal indebtedness of $10,000 when it should have secured only an annuity of $400. It is not claimed that this was a mutual mistake. Appellant William C. Paul testifies that he had not talked the matter over with his father before they went to Mahaffey's office, and that he said nothing while in the office, and that he read over the notes after they were drawn and then signed them. Certainly appellant could not claim there was any mistake made as to his part or directions in the matter. Mahaffey explained to appellant what was in the papers, and he further testifies that he heard his father give Mahaffey no directions as to the drafting of the papers, as his father had instructed Mahaffey a day or two before how they should be drawn. There is no testimony in the record tending to show that the notes

and mortgage were not drawn just as the father, John Paul, had directed them to be drawn and as he desired them to be drafted, and this being the case, it is not a case of mutual mistake or a mistake as against either of the parties. According to the testimony of John Paul the notes and mortgage were drafted according to his directions and as he wanted them and in accordance with the contract between the parties. William Malcolm, a neighbor, who was present when the papers were drafted, testifies that he heard appellant say he would pay his father $10,000 for the farm. We have examined the record carefully and the strong preponderance of the testimony is that there was no mistake of any kind in the drafting of these instruments, and that appellant William C. Paul obtained this land for $10,000 by this arrangement, for which William Malcolm had offered over $20,000 a few days before.

Appellants further contend that the execution of the quitclaim deed by Mrs. John Paul and John Paul in Germany in October, 1906, and the delivery of the same to appellant William C. Paul, operated as a release of the mortgage. Appellant has never treated this instrument with so much dignity as his counsel accord to it in argument. Appellant's answer admits an indebtedness, based upon these instruments, to the amount of an annuity, and with the former payments and the payment into court has paid annuities for nearly fifteen years upon this obligation. The quitclaim deed purports to transfer no rights except such as the wife of John Paul had—the inchoate right of dower—and it may have been suggested that John Paul sign the deed to comply with the Homestead Exemption Act of this State. Appellant William C. Paul testifies that the only purpose of this deed was to secure a release of the dower rights of the wife, and in equity the rule is that a merger will not take place unless it is the intention of the parties or equitable

that a merger should take place. 2 Jones on Mortgages (7th Ed.), sec. 855, p. 374; *Worcester Nat. Bank v. Cheeney*, 87 Ill. 602; *Richardson v. Hockenhull*, 85 Ill. 124; *Huebsch v. Scheel*, 81 Ill. 281. There is no merit in the point raised and we have sufficiently exaggerated its importance.

Finally, appellants contend that the demand of the alien property custodian was only for the principal of said debt and interest from the 1st day of March, A. D. 1916, and that in no event can such custodian claim to take over the title to any other property or to any further sums, and that the sum of $3,050 paid into court covered all of the interest accrued upon such indebtedness, and that appellee could not recover more than the principal of said debt. The demand was based upon the report of the appellant William C. Paul and the bill prayed that an account may be taken and that the defendants, or some of them, may be ordered to pay to the complainant whatever sum there may appear to be due to him upon the taking of such account, and the bill prayed for "other and further relief."

On the taking of proofs it developed that appellant had not paid all of the interest due on said notes to March 1, 1916. In only one year had he paid the full sum of $400. Some years he had paid only $300, and in 1915 he had paid only $150. These deferred payments, together with the added interest after the debt became due, brought the unpaid interest up to the sum of $1,161.10, and we know of no rule preventing the alien property custodian from making a demand by bill in chancery, as well as by some other informal method. The effect of the demand was to transfer the title of the debt, the security, to the alien property custodian and the interest was a mere incident of the principal indebtedness. We find no error in the amount for which said decree was entered.

Appellants complain because the executor and lega-tees under the will of John Paul, deceased, are permit-

ted to file briefs, as appellees in this case, and insist that not having taken an appeal from said decree they are not further interested in this litigation. Their answer supports the allegations in the bill of complaint and their interest in this litigation, if they have any, is to support the decree. Under the ''Trading with the Enemy Act,'' section 9 provided for two remedies to persons claiming an interest in enemy property taken over by the alien property custodian:

''He may file a claim with the Alien Property Custodian and follow it up by prosecuting the claim to the President, or he may institute suit in the District Court within six months,'' as set out.

Amendments were made to the ''Trading with the Enemy Act'' March 4, 1923, by which it was provided:

''That the claim of any naturalized American citizen under the provisions of this Act shall not be denied on the ground of any presumption of expatriation which has arisen against him, under the second sentence of section 2 of the Act entitled 'An Act in reference to the expatriation of citizens and their protection abroad,' approved March 2, 1907, if he shall give satisfactory evidence to the President, or the court, as the case may be, of his uninterrupted loyalty to the United States during his absence, and that he has returned to the United States, or that he, although desiring to return, has been prevented from so returning by circumstances beyond his control.''

Under the provisions of the Federal Act cited, the executors and legatees under the will of John Paul, deceased, do have an interest in supporting the decree of the lower court, and are proper parties to be heard on this appeal, and we conclude there is no error in permitting them to file briefs in this cause.

A motion is taken with the case on the part of the alien property custodian, appellee, to tax the costs of an additional abstract in the case against the appellants, and the motion is allowed and the clerk of this court is directed to tax costs for such additional abstract.

Finding no error in the record of the circuit court of McLean county warranting a reversal or modification of the decree, such decree is affirmed.

*Affirmed.*